FILED
RICHARD W. NAGEL
CLERK OF COURT

2017 NOV 21  AM 10: 36

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 513-571-2690 (Metro PCS (T-Mobile) ) | CASE NO. **1 17MJ-898** <br> <u>UNDER SEAL</u> |

**AFFIDAVIT IN SUPPORT OF**
**<u>AN APPLICATION FOR A SEARCH WARRANT</u>**

I, Matthew Wenker, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.       I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **513-571-2690** ("**Target Telephone**"), whose service provider is Metro PCS (T-Mobile), a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054 The targeted cell phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.       I have been employed as a Special Agent (SA) with the Federal Bureau of Investigation (FBI) since July have 2011, and have conducted investigations into criminal enterprises, narcotics investigations, organized crime, and violent crimes to include the unlawful possession and possession with the intent to distribute of controlled substances, as well as the associated conspiracies in violation of Title 21, United Stated Code, Sections 841(a)(1) and 846. My investigative experience is derived from working on the Mexican Border in Sierra Vista, Arizona, the U.S. territory Puerto Rico, and Cincinnati, OH.  Before being employed as a SA with the FBI, I was a Special Operations U.S. Army Ranger with four combat deployments to

Afghanistan and Iraq. My formal education consists of a Bachelors of Accounting and a Masters of Business Administration (MBA).

3.  I have conducted investigations into criminal enterprises, narcotics investigations, organized crime, and violent crimes to include the unlawful possession, possession with the intent to distribute, and actual distribution of controlled substances, as well as the associated conspiracies in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Your affiant has also participated in the execution of federal search warrants and federal arrest warrants in relation to these investigations. Additionally, your affiant has participated in the installation and monitoring of tracking devices for vehicles in order to determine the whereabouts of believed drug traffickers and their illicit merchandise. Your affiant has also been involved with the administrative duties and monitoring responsibilities of Title III Wire intercepts, and analysis of pen registers related to narcotics and gang investigations. Your affiant is familiar with their methods of concealing the whereabouts of their illegal drugs, the methods they use to keep law enforcement officers from finding evidence of drug trafficking operations as well as the methods they use to keep law enforcement officers from finding evidence of drug trafficking operations as well as the methods they use to prevent others unfamiliar with their criminal conduct from observing things indicative of drug trafficking. Your affiant is also familiar with the paranoia surrounding most drug traffickers and the common ways in which wholesale drug distributors attempt to conceal their assets, their purchases, and other financial dealings that could be traced to them.

4.  During the course of my law enforcement career I have conducted and participated in the investigation of numerous criminal offenses, including those involved in the current investigation. I have participated in illicit drug trafficking investigations, violent crimes investigations, and gangs and criminal enterprise investigations, ranging from street level dealers to major drug suppliers. These investigations have also included the unlawful importation,

possession with intent to distribute and distribution of illegal substances, the related money laundering instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses. These investigations during my career, which have resulted in the seizure of narcotics, arrests of suspects, their prosecution, conviction; have involved: the use of confidential informants; the analysis of pen registers, trap and trace, and toll records; physical surveillances; electronic surveillances to include the use of poll cameras and vehicle cameras; and the execution of search warrants.

5.      Through my training and experience I am aware that drug traffickers often communicate with their customers, couriers, and/or associates through the use of standard hard-line telephones, cellular telephones and digital display paging devices, or use of multiple telephones or other devices, to avoid detection by law enforcement.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 United States Code, Sections 841(a)(1) and 846 have been committed, are being committed, and will be committed by Jose Lopez ALBARRAN, and other as-yet unknown individuals. There is also probable cause to believe that the location of **Target Telephone** will constitute evidence of those criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

### THE RELEVANT FACTS

8.      1.      The FBI Cross Border Violence Task Force (CBVTF) is investigating the bulk cash narcotics proceeds money laundering operations of Jose Lopez

3

ALBARRAN (ALBARRAN) as a participant in a criminal enterprise based in Culiacan, Sinaloa, Mexico and operating throughout the United States that utilize the subject telephone in the district of Southern District of Ohio for violations of federal criminal laws, including, but not limited to, conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h); the distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of a communication facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); and conspiracy to commit controlled substances trafficking offenses, in violation of 21 U.S.C. § 846 ("the Target Offenses").

9.          2.          As further discussed below, there is probable cause to believe that:

(i) ALBARRAN and other members of the criminal organization based in Culiacan, Mexico, (the "Target Subjects") have committed, are committing, and will continue to commit one or more of the Target Offenses; (ii) that the subject telephone is being used, and will continue to be used by ALBARRAN and members with the transnational criminal organization to facilitate the commission of one or more of the Target Offenses; and (iii) the data obtained from the Requested Location Information and the cell site locations and telecommunications records concerning the **subject telephones** will constitute and/or will lead to evidence, fruits, and instrumentalities of the Target Offenses as well as to the identification of the individuals who are committing those and related crimes.

10.          3.          I personally have participated in the investigation set forth below, which is being conducted by FBI Special Agents and Task Force Officers in the FBI, San Diego Field Division, and Cincinnati among others. Based on my participation in the current investigation, my training and experience, my review of reports written by other FBI agents and local officers in the Cincinnati Field Division, the San Diego Field Division, the Target Subjects

are operating a criminal enterprise involving narcotics trafficking and the laundering of bulk cash proceeds from the sale of narcotics.

11.        4.        In September 2015, an FBI Confidential Human Source[1] ("CHS-1") began providing information to the FBI leading to the identification of ALBARRAN and his participation in a criminal enterprise based in Culiacan, the capital of the State of Sinaloa, Mexico, and operating throughout the United States. In this investigation, the San Diego Cross Border Violence Task Force ("CBVTF") has used CHS-1 to participate in multiple controlled money "pickups" in cities across the United States, following a common pattern. Later, the CBVTF cultivated a relationship with ALBARRAN through a CBVTF Undercover Employee [UCE-1], who represents himself/herself as the manager of a money laundering organization that offers its services to ALBARRAN in the pickup and laundering of bulk cash narcotics proceeds. ALBARRAN has stated in conversations with UCE-1 that the source of the bulk cash that he brokers the pickup and laundering of is proceeds from the sales of illicit narcotics. Since March, 2016, ALBARRAN has communicated directly with UCE-1 to facilitate the pickup and laundering of bulk cash located in cities throughout the United States. Additionally, in March, 2017, a second UCE [hereinafter UCE-2] was introduced who represents himself/herself as an individual who works alongside UCE-1. As described below, a pickup typically is initiated when ALBARRAN contacts a UCE [UCE-1 or UCE-1] and provides him/her with the name or alias of a courier and a phone number at which to contact the courier. ALBARRAN sometimes provides the UCE with a coded phrase to provide to the courier in order to communicate that the UCE has been designated by the Target Subjects to pick up the money. Generally, the UCE

---

[1] CHS-1 has been cooperating since September 2015. CHS-1's motivation is to assist CHS-1's son in avoiding prosecution. To date, CHS-1 has provided reliable and independently corroborated information to law enforcement, including the interception of $980,269 and the seizure of $425,000 of bulk cash proceeds from the sale of narcotics. CHS-1 has been compensated $34,000 with the approval of the United States Attorney's Office in the Southern District of California.

communicates with the courier to arrange the specifics of the pickups including a discussion of the amount of money and location for the meeting. If and when the pickups are successfully completed, the money is officially counted, deposited to FBI controlled accounts, and disbursed to accounts controlled by ALBARRAN. To date, investigators, with the assistance of CHS-1 and then UCE-1/UCE-2, have completed several successful controlled pickups, reverse money laundering pickups, and/or seizures of U.S. currency in Kansas City, Cincinnati, New York City, Philadelphia, San Diego, and the Boston area. These controlled operations involved interceptions totaling approximately $2 million, and/or seizures totaling $700,000. ALBARRAN agreed to and did utilize his associates to launder the said cash for UCE-1 and his/her fictitious organization, picking it up in said cities and then depositing into FBI controlled accounts.

12.

13.     5. The CBVTF and FBI Cincinnati (CI) are currently investigating Raul TREJO, who participates as a bulk cash facilitator in Cincinnati, Ohio. On February 22, 2017, TREJO arranged for his son (hereafter MINOR1) to deliver $179,800 bulk cash to a CBVTF UCE. On March 2, 2017, TREJO and MINOR1 delivered $155,980 to a CVVTF UCE. The bulk cash deliveries are believed to be the proceeds from the sale of illicit narcotics.

14.     6. On May 4, 2017, the CBVTF obtained authorization from the Honorable William Q. Hayes to conduct a Title III intercepts of TREJO's telephone.

15.     7. On May 10, 2017, monitored a conversation between TREJO and a Mexican telephone 52-1-686-264-6298, later identified as Jose Maria CHAVEZ-Maria aka CHEMA (hereafter CHEMA), in which a conversation took place in Spanish discussing a delivery and pick-up of an item at TREJO's. After the call, TREJO placed a telephone call to telephone number 513-464-0377 and had a conversation about meeting the following day.

16.        8. On May 11, 2017, surveillance identified a blue Dodge Ram bearing Ohio license plate HBD-3112, arrive at TREJO's residence. Donte HOLDBROOK was observed exiting the vehicle and carried a white bag into the residence. HOLDBROOK appeared to have left the bag inside of the residence when he left. The blue Dodge Ram is registered to HOLDBROOK's mother, Lori Quinn.

17.        9. In addition, on May 4, 2017, Middletown Police Department Narcotics Unit conducted a controlled buy of Fentanyl from Donte HOLDBROOK. HOLDBROOK was driving the blue Dodge Ram bearing Ohio license plate HBD-3112 during the transaction and utilized telephone 901-273-3683 for the transaction.

18.        10. On July 25, 2017, FBI Cincinnati surveillance observed known narcotics supplier Donte HOLDBROOK and Mariela PENALOZA arrive at known bulk cash facilitator, Raul TREJO's, residence. Donte HOLDBROOK carried a large bag into the residence. Donte HOLDBROOK then left the residence empty handed and drove away with PENALOZA. Approximately an hour later at around 11:42 PM, Donte HOLDBROOK arrived at Raul TREJO's residence carrying a large box and PENALOZA carried a light colored shopping type bag and went into the residence.   At the same time, a light in color sedan backed into the driveway of Raul TREJO at what appeared to be the direction of Donte HOLDBROOK. The telephone number known to be utilized by Donte HOLDBROOK, 901-273-3683, was in contact with target telephone, 757-324-1286, throughout the evening of July 25, 2017 and into the early morning of July 26, 2017. Telephone number 757-324-1286 was identified as belonging to Jettie BAILEY Jr.

19.        11. At approximately 00:32 a.m., on July 26, 2017, the light colored sedan then backed into the garage and Raul TREJO's and the garage door shut close. The vehicle was in the garage until approximately 1:50 a.m when the garage door was opened the vehicle pulled out

7

with the back trunk lid open. Law enforcement believes that illicit contraband was loaded into the back of the light colored sedan. Several minutes later, the light colored sedan left along with Donte HOLDBROOK and Mariela PENALOZA.

20.    12.    Pen Register Trap and Trace and GPS positioning federal court orders were received for BAILEY's  757-324-1286.  On August 12, 2017, a law enforcement interdiction was conducted on BAILEY's vehicle as it drove from Phoenix, Arizona to Middletown, Ohio. Approximately five kilograms of illicit narcotics were located within the gas tank of the vehicle which tested positive for the presence of heroin, fentanyl, and ketamine with a street value of approximately $500,000.

21.    13.    During November of 2017, Middletown Police Department Narcotics Detective Larry Fultz advised that a reliable confidential informant (CI), who has previously conducted controlled narcotics purchases from several members of the HOLDBROOK Drug Trafficking Organization (DTO), advised that Donte HOLDBROOK is currently using Raymond Scott COMBS and his wife, Cynthia COMBS, as the drug mules to pick up kilograms of narcotics by driving to states out west in vicinity of the U.S. Mexican border after the arrest of Jettie BAILEY Jr.  The COMBs' use **subject telephone 513-571-2690**.  The CI provided that the COMBS' receive $10,000 in payment for making each mule trip out west.  This coincides with the Jettie BAILEY Jr. mule trips, as he was also paid $10,000 for each trip.  The CI is cooperating for case consideration and has been deemed reliable on numerous occasions, including conducting multiple successful law enforcement evidentiary controlled narcotics purchases.  The information the CI has provided on the HOLDBROOK DTO has proved to be valuable over the course of the investigation and has been corroborated through multiple unrelated sources of information without issue.

22.    14. On November 20, 2017, a spoof call was placed to **subject telephone 513-571-2690** and a female answered the phone and identified herself as "Cynthia." It is believed that Cynthia is Cynthia COMBS. A toll analysis on **513-571-2690** showed that is has had frequent previous communications with HOLDBROOK DTO member and known narcotics supplier Charleston QUINN's **subject telephone 513-267-2410**. A public source Facebook search showed **513-571-2690** as being registered to "Scott Combs."

23.    15. The same reliable CI also advised that recently Scott COMBS and Cynthia COMBS were held by Mexican Drug Cartel members in Las Vegas, Nevada because Donte HOLDBROOK refused to pay for narcotics because they were of a lower than expected quality. Since then, Donte HOLDBROOK and the Mexican narcotics suppliers worked out their issues and are going to continue business. Donte HOLDBROOK and Charleston QUINN have both provided to the CI that they are receiving some high quality "fire" illicit narcotics in the near future, possibly even within the next couple of days.

24.    16. The reliable CI advised Donte HOLDBROOK is utilizing **subject telephone 602-668-2163**, and several Middletown, Ohio residents have also provided that Donte HOLDBROOK and Charleston QUINN are continuing to sell illicit narcotics throughout the community. A toll analysis on HOLDBROOK's **subject telephone 602-668-2163** showed communication with Mariela PENALOZA's known telephone number, 513-628-9054. Charleston QUINN is utilizing **subject telephone 513-267-2401**. Previously on March 29, 2017, Middletown Police Department Narcotics Unit conducted a controlled one ounce purchase of fentanyl from Charleston QUINN on his **513-267-2401** telephone.

25.    17. The requested information will assist agents in locating Donte HOLDBROOK, Charleston QUINN, Scott COMBS, and Cynthia COMBS and other individuals involved in the HOLDBROOK DTO. The information provided will help to identify vehicles

and locations used to launder money and distribute narcotics, thereby allowing for surveillance, interdiction efforts, and arrests to be made.

26.    18. In my training and experience, I have learned that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephone to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone, and in some cases, the "sector" to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

27.    19. Based on my training and experience, I know that wireless phone companies can collect E-911 Phase II data about the location of the target cell phone, including by initiating a signal to determine the location of the target cell phone on the cellular network or with such other reference points as may be available. I also know that wireless phone companies can collect cell-site data about the cell phone.

28.    Based on the aforementioned facts and reporting, I believe there is probable cause to show that Jose Lopez ALBARRAN is using **Target Telephone** to commit federal narcotics

offenses and that the information requested will assist the FBI in identifying co-conspirators and additional cellular devices owned and operated by the targeted subjects.

29.     In my training and experience, I have learned that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

30.     Based on my training and experience, I know that wireless phone companies can collect E-911 Phase II data about the location of the target cell phone, including by initiating a signal to determine the location of the target cell phone on Metro PCS (T-Mobile) network or with such other reference points as may be reasonably available.

31.     Based on my training and experience, I know that wireless phone companies can also collect cell-site data about the target cell phone.

## AUTHORIZATION REQUEST

32.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

33.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

34.     I further request that the Court direct the Metro PCS (T-Mobile) to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Metro PCS (T-Mobile). I also request that the Court direct Metro PCS (T-Mobile) to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Metro PCS (T-Mobile) services, including by initiating a signal to determine the location of the target cell phone on Metro PCS (T-Mobile) network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

The government shall reasonably compensate Metro PCS (T-Mobile) for reasonable expenses incurred in furnishing such facilities or assistance.

35.    I further request that the Court authorize the government to install and operate a cell-site simulator to obtain dialing, routing, addressing, and signaling information from the target cell phone to determine the location of the target cell phone.

36.    I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the target cell phone outside of daytime hours. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is probable cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Matthew Wenker
Special Agent
FBI

Subscribed and sworn to before me on this 21 day of November, 2015.

HONORABLE STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number **513-571-2690 (Target Telephone)**, whose wireless service provider is [-Metro PCS (T-Mobile), a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

2. Information about the location of the cellular telephone assigned call number **513-571-2690 (Target Telephone)** that is within the possession, custody, or control of Metro PCS (T-Mobile), including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the target cell phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the target cell phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Metro PCS (T-Mobile) ], [Metro PCS (T-Mobile) is required to disclose the Location Information to the government. In addition, Metro PCS (T-Mobile) must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Metro PCS (T-Mobile) services, including by initiating a signal to determine the location of the target cell phone on Metro PCS (T-Mobile) network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Metro PCS (T-Mobile) for reasonable expenses incurred in furnishing such facilities or assistance. In addition the government may initiate a signal to determine the location of the target cell phone.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).